**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| HOLLY M. DUFF, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13-2466-RDR |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the | ) |
| Social Security Administration, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

On February 1, 2010, plaintiff filed applications for social security disability insurance benefits and supplemental security income benefits. These applications alleged a disability onset date of February 29, 2008. On January 10, 2012, a hearing was conducted upon plaintiff's applications. The administrative law judge (ALJ) considered the evidence and decided on February 8, 2012 that plaintiff was not qualified to receive benefits. This decision has been adopted by defendant. This case is now before the court upon plaintiff's motion to reverse and remand the decision to deny plaintiff's applications for benefits. After due consideration, the court shall reverse and remand the decision for further administrative review because the court is convinced that the ALJ did not properly evaluate the opinion of a treating physician.

I.  STANDARD OF REVIEW

To qualify for disability benefits, a claimant must establish that he or she was "disabled" under the Social Security Act, 42 U.S.C. § 423(a)(1)(E), during the time when the claimant had "insured status" under the Social Security program. See Potter v. Secretary of Health & Human Services, 905 F.2d 1346, 1347 (10th Cir. 1990); 20 C.F.R. §§ 404.130, 404.131.  To be "disabled" means that the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

For supplemental security income claims, a claimant becomes eligible in the first month where he or she is both disabled and has an application on file.  20 C.F.R. §§ 416.202-03, 416.330, 416.335.

The court must affirm the ALJ's decision if it is supported by substantial evidence and if the ALJ applied the proper legal standards. Rebeck v. Barnhart, 317 F.Supp.2d 1263, 1271 (D.Kan. 2004).  "Substantial evidence" is "more than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id., quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  The court must examine the record as a whole, including whatever in the record fairly

detracts from the weight of the defendant's decision, and on that basis decide if substantial evidence supports the defendant's decision. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994) (quoting Casias v. Secretary of Health & Human Services, 933 F.2d 799, 800-01 (10th Cir. 1991)). The court may not reverse the defendant's choice between two reasonable but conflicting views, even if the court would have made a different choice if the matter were referred to the court de novo. Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting Zoltanski v. F.A.A., 372 F.3d 1195, 1200 (10th Cir. 2004)).

II. THE ALJ'S DECISION (Tr. 13-21).

There is a five-step evaluation process followed in these cases which is described in the ALJ's decision. (Tr. 14-15). First, it is determined whether the claimant is engaging in substantial gainful activity. Second, the ALJ decides whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments which are "severe." At step three, the ALJ decides whether the claimant's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Next, the ALJ determines the claimant's residual functional capacity and then decides whether the claimant has the residual functional capacity to perform the requirements of his or her past relevant work. Finally, at the last step of the

3

sequential evaluation process, the ALJ determines whether the claimant is able to do any other work considering his or her residual functional capacity, age, education and work experience.

In this case, the ALJ decided plaintiff's application should be denied on the basis of the fourth step of the evaluation process. The ALJ determined that plaintiff maintained the residual functional capacity to perform her past relevant work as a nanny, daycare attendant, security guard or hostess.

The ALJ made the following specific findings in his decision. First, plaintiff meets the insured status requirements for Social Security benefits through March 31, 2012. Second, plaintiff did not engage in substantial gainful activity after February 29, 2008, the alleged onset date of disability. Third, plaintiff has the following severe impairments: pelvic fracture; pituitary adenoma; Charcot-Marie-Tooth Syndrome; hypothyroidism; hypertension; inflammatory pericardial effusion; obesity and osteopenia.[1] Fourth, plaintiff does not have an impairment or combination of impairments that meet or medically equal the listed impairments in 20 C.F.R. Part

---

[1] The court in VanOvermeiren v. Colvin, 2013 WL 3753437 *1 n.2 (D.Minn. 7/16/2013) cites the following definition for Charcot-Marie-Tooth Syndrome: "a peripheral muscular disorder, a common feature of which is marked wasting of the distal part of the extremities, usually involving the legs before the arms."

404, Subpart P, Appendix 1. Fifth, plaintiff has the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). And, finally, the ALJ determined that plaintiff is able to perform her past relevant work as nanny, daycare attendant, security guard or hostess. This last finding was based in part upon the testimony of a vocational expert, specifically the following exchange:

> Q. Second hypothetical, we have the same individual. This person can sit six hours in an eight-hour day, stand and walk four hours in an eight-hour day, can occasionally lift 20 pounds, frequently lift 10 pounds. This person can occasionally climb stairs, balance, stoop, kneel, crouch, crawl, should never climb ladders, scaffolds, or ropes. Based on hypothetical number two, would she be able to return to any of the past jobs?
>
> A. Your Honor, based on the description in the record ... As performed, yes to the nanny and the daycare ...

(Tr. 45). However, the vocational expert did not make reference to plaintiff's past relevant work as security guard or hostess, other than to say that these occupations are classified as light work. (Tr. 44).

III. THE DECISION TO DENY BENEFITS SHALL BE REVERSED AND REMANDED FOR FURTHER CONSIDERATION BECAUSE THE ALJ DID NOT PROPERLY EVALUATE THE OPINION OF DR. ECK, ONE OF PLAINTIFF'S TREATING PHYSICIANS.

Most of the argumentation in this case concerns the opinions of Dr. Steven Gerber, a nonexamining physician, and the opinions of Dr. Leigh Eck, one of plaintiff's treating physicians. Dr. Gerber is a medical expert who gave brief

5

testimony during the administrative hearing in this case. Dr. Gerber testified that he reviewed the medical records pertaining to plaintiff and he concluded that plaintiff had the ability "to stand and/or walk for four out of eight hours with normal breaks, sit six out of eight hours with normal breaks, lift and carry [20 pounds occasionally and 10 pounds frequently], [perform all postural positions occasionally], and no ladders or scaffolding." (Tr. 31-32). The ALJ gave Dr. Gerber's opinion "great weight" because "he had the opportunity to review the most up to date medical records and because his opinion is consistent with the medical evidence of record." (Tr. 20). In contrast, the ALJ gave "no weight" to the opinion of Dr. Leigh Eck, a treating physician. On November 29, 2011, Dr. Eck filled out a check-a-box form providing her opinion of plaintiff's physical capacities.[2] (Tr. 824-827). The form sets forth the same lifting and carrying restrictions, the same or expanded sitting abilities, and the same or similar postural restrictions as Dr. Gerber stated. But, the form states (differing from Dr. Gerber's testimony) that plaintiff can stand or walk for less than one hour at the time; that plaintiff needs to elevate her

---

[2] In addition, Dr. Eck wrote a short letter on December 1, 2011 which states in part:
> I see Ms. Duff for panhypopituitarism related to a pituitary tumor. . . . In addition to this condition, Ms. Duff has Charcot-Marie-Tooth. I am not an expert on Charcot-Marie-Tooth, but my perception is that this condition is quite debilitating to Ms. Duff. These chronic illnesses may result i[n] difficulty for Ms. Duff to participate in a normal stressful work environment.

6

feet for two hours during an 8-hour workday; that plaintiff occasionally has debilitating pain; that plaintiff takes prednisone which increases irritability and social isolation; and that plaintiff would need to be absent from work more than three times a month.[3]

The court shall not address many of the arguments plaintiff makes with regard to the ALJ's analysis and presentation of Dr. Gerber's testimony. Instead, the court shall focus upon plaintiff's contention that the ALJ failed to properly consider the opinion of Dr. Eck. Because the court agrees with this contention, it is unnecessary for the court to decide plaintiff's other arguments.

The first step in evaluating a treating doctor's opinion is to determine whether the opinion is entitled to controlling weight. Langley v. Barnhart, 373 F.3d 1116, 1119 (10th Cir. 2004). This is accomplished in two stages: 1) determining whether the opinion is supported by medically accepted clinical and laboratory diagnostic techniques and, if so, then 2) determining if the opinion is consistent with other substantial evidence in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003). The ALJ found fault with Dr. Fck's opinions at the second stage.

---

[3] The form also mentions dizziness, numbness, depression, short attention span, memory problems, and behavior extremes. But, these problems are not the focus of plaintiff's claims.

7

The second step in evaluating a treating doctor's opinion is determining what amount of weight to attach to the opinion if the opinion does not deserve controlling weight. An ALJ may consider such factors as: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; 3) the degree to which the physician's opinion is supported by relevant evidence; 4) consistency between the opinion and the record as a whole; 5) whether or not the physician is a specialist in the area upon which the opinion is rendered; and 6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. Langley, 373 F.3d at 1119.

The ALJ attributed "no weight" to Dr. Eck's opinions because "the treatment notes simply do not support her opinion, and her opinion that the CMT [Charcot-Marie-Tooth] is debilitating appears based on the claimant's subjective complaints rather than any objective testing." (Tr. 19). When discussing the treatment notes in the record the ALJ commented:

> The treatment notes essentially detail that the claimant was doing well on her various treatments and medications. The numerous physical and neurological examinations in the record do not contain objective findings to support that the neurological examinations in the record do not contain objective findings to support that the claimant could not perform work activities at least consistent with [the ALJ's assessment of her residual functional capacity].

8

> Moreover, the claimant's own statements and actual activities are not fully consistent with her allegations of a complete inability to work. At her gynecology appointment in September 2008 and her initial September 2008 appointment with Dr. Jansen to establish care, the claimant reported she had not taken any medications since 2001. She reported to Dr. Jansen that she felt well.

(Tr. 20).

The court's review of the medical records is not firmly consistent with the ALJ's conclusions. On October 30, 2008, plaintiff reported that she felt well; but she also stated that she became tired after walking a block or two. (Tr. 421). This condition, which appears inconsistent with the requirements for nanny or daycare position, seems to have persisted as noted later.

On January 15, 2009, plaintiff had "no complaints" and denied fatigue, but did mention muscle weakness. (Tr. 577). Plaintiff mentioned fatigue to Dr. Eck on April 8, 2009. (Tr. 512). She denied fatigue to Dr. Jansen on January 28, 2010. (Tr. 583). Dr. Desta recorded no muscle weakness on March 2, 2010. (Tr. 587). About the same time, however, Dr. Eck stated that plaintiff was positive for fatigue, weakness and decreased energy. (Tr. 597-98). In April 2010, plaintiff reported no current complaints other than mild fatigue and some other immaterial matters to Drs. Teng and Awadh. (Tr. 765-66). In May 2010, Dr. Fortune commented that plaintiff had no difficulty

9

walking but became somewhat fatigued after 30 minutes. (Tr. 637). In September 2010, Dr. Gollub stated that plaintiff was "doing well." (Tr. 669). In October 2010 and March 2011, doctors recorded that plaintiff was negative for fatigue. (Tr. 707, 754, 756). But, in August 2011, Dr. Sharma stated that plaintiff was positive for weakness and fatigue. He noted that plaintiff's exercise tolerance was limited to walking about 2-3 blocks because of her Charcot-Marie-Tooth disease. (Tr. 704, 841). In October and November of 2011, plaintiff reported pain after baby sitting and discomfort after shopping and carrying packages. (Tr. 801-02). Dr. Eck stated that plaintiff had muscle pain which limited her from standing or walking for long periods in November 2011, but plaintiff did not report fatigue. (Tr. 815). In December 2011, Dr. Gollub reported that plaintiff was "doing well," although there was no change in plaintiff's exercise tolerance. (Tr. 834). He also noted that plaintiff was positive for fatigue and muscle weakness. (Tr. 835).

These treatment notes appear to be at least as consistent with Dr. Eck's assessment of plaintiff's ability to stand or walk for periods of time as they are consistent with Dr. Gerber's assessment. Further, contrary to the ALJ's decision, the record does not reflect that Dr. Gerber relies upon more or better "objective" evidence for his opinion than Dr. Eck does for her opinion. Under these circumstances, we believe Dr.

Eck's opinion deserves more weight. See Watkins, 350 F.3d at 1300 (citing regulations directing that more weight be given to opinions from treating sources). Contrary to Watkins, the ALJ failed to provide clear or convincing reasons for giving Dr. Eck's opinion "no weight." An "ALJ must give good reasons in the . . . decision for the weight he ultimately assigns to the [treating physician's] opinion," and if he "rejects the opinion completely, he must then give specific, legitimate reasons for doing so." Watkins, 350 F.3d at 1301 (interior quotations omitted). Here, the ALJ's decision does not identify the records or objective findings which support rejecting Dr. Eck's conclusions as to plaintiff's ability to stand or walk for lengthy periods of time. Accordingly, the court does not find a good basis in the ALJ's decision for crediting Dr. Gerber's assessment of plaintiff's condition over that of one of plaintiff's treating physicians.

In reaching this decision, the court is not finding that Dr. Eck's opinions deserve controlling weight. We further acknowledge that a treating doctor's opinion on issues reserved to the Commissioner is never entitled to controlling weight. Still, when an ALJ fails to give good reasons for the weight assigned to a treating physician's opinion, a remand is required. Krauser v. Astrue, 638 F.3d 1324, 1330 (10th Cir. 2011); see also, Langley, 373 F.3d at 1120 (while absence of

objective testing provided basis for denying controlling weight to treating physician's opinion, the ALJ was not entitled to reject it completely on this basis).

IV. THE COURT SHALL NOT DIRECT AN IMMEDIATE AWARD OF BENEFITS.

While the court has discretion to reverse and remand for an award of benefits, the court shall not do so because the court believes that additional fact finding and analysis may clarify the nature and extent of plaintiff's impairments.

V. CONCLUSION

The court shall reverse defendant's decision to deny plaintiff's applications for benefits. The court shall direct that this case be remanded to the Commissioner for further proceedings consistent with this opinion. This remand is made under the fourth sentence of 42 U.S.C. § 405(g).

**IT IS SO ORDERED.**

Dated this 14th day of May 2014, at Topeka, Kansas.

        _s/Richard D. Rogers_
        Richard D. Rogers
        United States District Judge